UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
AUTUMN BLACK, a woman; HEMERD                         :
BLACK, a man,                                         :
                                                      :
                          Plaintiffs,                 :
                                                      :
              v.                                      :
                                                      :
KRISTA RANLEY, a woman; KRISTA                        :
RANLEY, a person acting as a lawyer,                  :
                                                      :
                          Defendant.                  :
                                                      :
------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 8, 2017

17 Civ. 9026 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Autumn and Hemerd Black, a married couple, bring several constitutional claims under 42 U.S.C. § 1983 and several tort claims under New York law against Krista Ranley, an attorney for the New York City Administration for Children's Services ("ACS"), to vindicate alleged violations of their rights during neglect and removal proceedings that are ongoing in Bronx County Family Court (the "Family Court"). During those proceedings, Plaintiffs were adjudged to have neglected their five children on the bases of educational neglect; inadequate guardianship and supervision; and a failure to provide adequate food, clothing, and shelter. As a result, their children, D.B., J.B., J.B., A.B., and P.B., were placed in the custody of the Commissioner of Social Services of Bronx County, and Plaintiffs were ordered to undergo mental health evaluations, complete parenting classes, and visit their children regularly.

Plaintiffs now seek an order restoring custody of their children and money damages.

No one doubts Plaintiffs' love and concern for their children. Nor does the Court question the sincerity of Plaintiffs' belief that their children were improperly removed from their custody. Precisely for these reasons, the Court does not underestimate the importance of these claims to Plaintiffs. After all, the Supreme Court has recognized that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights of man[.]'" *Stanley* v. *Ill.*, 405 U.S. 645, 651 (1972) (citations omitted). That said, the Court must be clear at the outset as to what it can and cannot do. The Court can assess the legal sufficiency of Plaintiffs' claims. In this regard, the Court carefully reviews Plaintiffs' pleadings and construes them with the liberality the law requires to ascertain whether Plaintiffs have pleaded any federal constitutional claims or state-law tort claims that, if proven, could entitle Plaintiffs to damages for violations of their rights.

But there are several forms of relief Plaintiffs have requested that the Court cannot grant. *First*, for the reasons discussed below, this Court cannot issue an order overturning any determination of the Family Court or stating that Plaintiffs' children must be returned to their custody. *Second*, the Court cannot grant relief for claims Plaintiffs bring *pro se* on behalf of their children. *Third*, as the Court has made clear in earlier filings and in its conversation with Plaintiffs at the initial conference in this matter, the Court cannot adopt Plaintiffs' terminology in which they refer to themselves as "prosecutors," to

their children as their "property," and to Defendant as the "wrongdoer," and it

must rebuff their efforts to establish a "common law court" and issue orders

imposing fines.  The Court refers to Mr. and Mrs. Black as Plaintiffs, to Ms.

Ranley as Defendant, named in both her official and personal capacities, and to

the children by their initials.  As the Court has noted previously, any orders

Plaintiffs have attempted to issue do not have any force or effect or, for that

matter, any impact on the Court's resolution of the instant motion.

Before the Court is Defendant's motion to dismiss.  For the reasons that

follow, Defendant's motion is granted in its entirety.[1]

---

[1]     The facts of this case are drawn from Plaintiffs' submissions and from Family Court documents of which the Court may take judicial notice.  Plaintiffs' Complaint (Dkt. #1) does not recount any of the facts underlying this case.  In response to Defendant's first motion to dismiss, Plaintiffs submitted a 60-page "Declaration of Facts" (Dkt. #31 ("Pl. Decl.")), and a 52-page opposition that laid out Plaintiffs' legal claims (Dkt. #33 ("Pl. Opp.")).  As noted in its Order dated February 21, 2018, the Court accepted the filings at Docket Entries 31 and 33 as amendments to Plaintiffs' pleadings.  (Dkt. #36). Accordingly, the Court will consult these submissions to assess the sufficiency of Plaintiffs' claims.  *See, e.g.*, *Walker* v. *Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").  Plaintiffs' Declaration of Facts contains numbered paragraphs that number from 1 to 19, and then re-start again at 1 and run through 529.  The Court does not cite to any paragraphs in the first numbered set.  Thus, all citations are to paragraphs in the set beginning with Paragraph 1 on the fourth page of the document.  Plaintiffs submitted their Declaration of Facts twice, and the second submission is at Docket Entry 48.  This version appears to be identical to the Declaration at Docket Entry 31, except that it contains a page that is missing from the prior version.  (*Compare* Dkt. #31, *with* Dkt. #48).  That page contains paragraphs numbered 80 to 89.  Accordingly, the Court will read the two Declarations together, and will cite to Paragraphs 80 to 89 as if they appeared in the Declaration at Docket Entry 31.

For convenience, the Court refers to Defendant's memorandum of law in support of her motion as "Def. Br." (Dkt. #41), and to her reply in support of her motion as "Def. Reply" (Dkt. #51).

**BACKGROUND**

**A.    Factual Background**

Plaintiffs submitted a 529-paragraph Declaration of Facts in connection with this motion.  The Court will not recount every allegation contained therein, but will instead focus on those facts most relevant to the instant motion.

Plaintiffs have five children, D.B., J.B., J.B., A.B., and P.B.  (Dkt. #1).  Plaintiffs first interacted with ACS in December 2015.  (Pl. Decl. ¶ 1).  ACS employee Yendry Bonilla came to Plaintiffs' apartment in the Bronx and asked whether the children were being homeschooled; she physically examined the children and looked around the apartment.  (*Id.* at ¶¶ 3-5).  Mrs. Black was at work at the time.  (*Id.* at ¶ 2).  Plaintiffs allege that Mr. Black informed Bonilla that Plaintiffs were homeschooling D.B. and A.B., both of whom were of school age, and that Bonilla stated that she did not see any signs of abuse or neglect.  (*Id.* at ¶¶ 5-8).  Plaintiffs deny the finding in the Family Court Order that Mr. Black stated they were *not* homeschooling their children at the time.  (*Compare id.* at ¶ 7 *with* Dkt. #42-3 (Family Court Order of Fact-Finding and Disposition ("Fam. Ct. Order")) 4).[2]  Plaintiffs allege that despite Bonilla's

---

[2]    In reviewing Defendant's motion, the Court also considers the Family Court Order of Fact-Finding and Disposition, dated July 13, 2017, which is attached as Exhibit C to the Declaration of Counsel in support of Defendant's Motion to Dismiss (Dkt. #42-3).  This Order may be found in the records of the Family Court, and Plaintiffs had notice of this Order from their participation in the Family Court proceedings.  Accordingly, the Court will take judicial notice of it and consider it in deciding Defendant's motion.  *See Licorish-Davis* v. *Mitchell*, No. 12 Civ. 601 (ER), 2013 WL 2217491, at *1 n.2 (S.D.N.Y. May 20, 2013).  The Court also takes judicial notice of the temporary orders of removal that were entered by the Family Court as to D.B., A.B., J.B., and J.B. on March 18,

statement to Mr. Black that she did not observe any indications of neglect, Bonilla nevertheless left a notice addressed to Mrs. Black stating that she "was suspected of maltreatment, neglect and abuse." (Pl. Decl. ¶ 9). Plaintiffs surmise that their landlord baselessly reported them to ACS following Plaintiffs' complaints regarding heat and hot water. (*Id.* at ¶¶ 10-15; *see also id.* at ¶¶ 16-19 (same allegation regarding second ACS visit)).

Later that month, Plaintiffs submitted homeschooling forms to the New York City Department of Education. At the same time, they continued to complain to their landlord regarding the condition of their apartment, resulting in what Plaintiffs claim to be continued "harassment" from ACS. (Pl. Decl. ¶¶ 20-25). For example, in January and February 2016, Plaintiffs lodged additional building violation complaints, and complained to the New York City Police Department ("NYPD") about their upstairs neighbor's son, whom Plaintiffs believed to be dealing drugs in their building. (*Id.* at ¶¶ 26-42). Plaintiffs allege that, in retaliation for their complaint about her son, their upstairs neighbor would "run her washing machine for several hours each day and allow[] the spin cycle to rain into [Plaintiffs'] kitchen." (*Id.* at ¶ 44). Because of the poor living conditions, the family made plans to move "as far away from the building as quickly as possible." (*Id.* at ¶ 40). On February 15, 2016, Bonilla again appeared at Plaintiffs' apartment. (*Id.* at ¶ 26). Mrs. Black was out at work. (*Id.* at ¶ 27). Plaintiffs allege that, at this point, ACS accused

---

2016, as well as the temporary removal order issued as to P.B. on June 9, 2016. These are attached as Exhibit E to counsel's declaration. (Dkt. #42-5).

both parents, not just Mrs. Black, of neglect, and that it was "apparent [that ACS's] motives were about more than homeschool documentation or verifying the educational achievements and activities of their children." (*Id.* at ¶¶ 28-29). Plaintiffs allege that Mr. Black told Bonilla about the family's plans to move, and that Bonilla stated that there was no evidence of neglect. (*Id.* at ¶¶ 31-32).

On March 12, 2016, Plaintiffs were again forced to contend with leaks from a washing machine running in the apartment above them. (Pl. Decl. ¶¶ 57-64). Mrs. Black was not in the home at the time. (*Id.* at ¶ 64). Plaintiffs allege that "Mr. Black requested [that the neighbor] turn off the water," but that the neighbor saw "this as an opportunity to avenge her son and retaliate" against Plaintiffs. (*Id.* at ¶¶ 61-62). The neighbor called the NYPD, and "within minutes multiple police officers from the 44th [P]recinct arrived" at Plaintiffs' apartment. (*Id.* at ¶ 63). In contrast with Plaintiffs' telling of these events, the Family Court Order cites to the testimony of NYPD Officer Michaels, who stated that Mr. Black went to the neighbor's apartment armed "with a machete and axe" and that the machete and axe were later observed in Plaintiffs' apartment. (Fam. Ct. Order 5).

Officer Michaels testified further that when she entered the apartment, she found Mr. Black to be incoherent and found D.B., A.B., J.B., and J.B. "standing naked on top of soaked newspaper behind a curtain" surrounded by "what appeared to be 30-40 bottles of urine." (Fam. Ct. Order 5-6). She also found "very little food beyond rotten vegetables and fruit and expired cans of

food." (*Id.* at 6).  Officer Michaels "observed there to be no water in the toilet, the sink inoperable, and the bathtub to be 'completely dirty.'"  (*Id.*).  Plaintiffs vigorously contest this description of their home.  (Pl. Decl. ¶ 70).  For example, Plaintiffs state that the children were laying newspapers to catch the leaks from their upstairs neighbor and were surrounded by bottles of soaking sea moss, "a nutritional superfood supplement[.]"  (*Id.* at ¶¶ 68-72).

Plaintiffs allege that NYPD officers "subsequently performed an unconstitutional arrest, illegal search of the apartment[,] and seizure of" their children.  (Pl. Decl. ¶ 82).  Mr. Black was taken to Lincoln Hospital due to Officer Michaels's "unprofessional, harmful, injurious[,] and procedurally deficient determination of Mr. Black being an 'emotionally disturbed person.'"  (*Id.* at ¶ 88).  Plaintiffs allege that Mrs. Black arrived at North Bronx Hospital, where she found her children and learned that the officers had attempted to "bribe" the children with food to get them to speak.  (*Id.* at ¶¶ 92, 111).  Plaintiffs allege that the officers' conduct and detention of the children violated the children's Fifth Amendment Rights.  (*Id.* at ¶ 94).  The children did speak to a social worker from ACS while at North Bronx Hospital.  (*Id.* at ¶ 112).  Plaintiffs allege that neither the children's discharge papers from North Bronx Hospital nor the social worker's notes corroborated the officers' account that the children were found covered in bodily waste.  (*Id.* at ¶¶ 111, 117).  The next day, Mr. Black was discharged from Lincoln Hospital and was told there was nothing wrong with him.  (*Id.* at ¶ 121).  Mr. Black "reluctantly" pleaded guilty to a harassment violation for which he completed anger management courses,

paid a fine, and was ordered to stay away from Plaintiffs' upstairs neighbor.
(*Id.* at ¶¶ 124-28).

On March 14, 2016, Bonilla returned to Plaintiffs' apartment to discuss
the events of March 12, 2016. (Pl. Decl. ¶¶ 129-30). Mrs. Black showed
Bonilla "the well-stocked kitchen cabinets [and] family purchased replacement
refrigerator[.]" (*Id.* at ¶ 130). Bonilla asked to hear Plaintiffs' eldest child read
aloud, and Plaintiffs allege that he read "fluently from a college level
textbook[.]" (*Id.* at ¶ 132). Plaintiffs further allege that Bonilla acknowledged
receiving Plaintiffs' homeschooling paperwork, and they deny telling Bonilla
that their children were *not* being homeschooled. (*Id.* at ¶¶ 133-38). Following
this visit from Bonilla, Plaintiffs consulted with attorneys on March 15, 2016,
who informed them that there was no Family Court case presently pending
against them. (*Id.* at ¶¶ 141-43). In reliance on this representation, Plaintiffs
began making plans to move to New Jersey, believing there was no pending
legal matter keeping them tied to New York. (*See id.* at ¶ 144). On March 17,
2016, Plaintiffs and their children moved temporarily to a hotel in New Jersey
while they applied for an apartment. (*Id.* at ¶¶ 155-60).

Also on March 17, 2016, ACS filed an initial neglect petition alleging that
D.B., A.B., J.B., and J.B. were victims of educational neglect and inadequate
guardianship and supervision. (Fam. Ct. Order 2). On March 18, 2016, Family
Court Judge David J. Kaplan held a hearing under § 1027 of the Family Court
Act and ordered that the children be remanded to the custody of ACS. (Dkt.
#42-5 ("Removal Order")). The Removal Order noted that Plaintiffs were not

present but that Bonilla had given them notice of the proceedings. (*Id.*). Judge

Kaplan found that removal was "necessary to avoid imminent risk to [the

children's] life or health." (*Id.*).[3] Judge Kaplan found:

> The respondent father threatened a neighbor with an
> axe and a machete and a police officer found the
> children standing naked in the home with no
> explanation. The respondent mother has not cooperated
> with ACS nor given any indication that she would
> comply with an order of protection against the father.

(*Id.*). Judge Kaplan concluded by finding that removing the children from the

home was necessary because "the father's erratic behavior and the mother's

failure to protect placed the child[ren] at risk." (*Id.*). Finally, Judge Kaplan

issued a warrant for Mrs. Black's arrest. (Dkt. #42-4).

While residing in New Jersey, Mr. Black continued to attend hearings

related to his criminal case, and Mrs. Black continued to commute to her office

in midtown Manhattan. (Pl. Decl. ¶ 168). Plaintiffs state that they never

received a summons to appear in court. (*Id.* at ¶ 167). On April 29, 2016, Mrs.

Black gave birth to Plaintiffs' fifth child, P.B. (*Id.* at ¶ 174).

On May 27, 2016, Mr. Black appeared for a hearing related to his

criminal case, at which time he was arrested pursuant to a warrant and

brought to Family Court. (Pl. Decl. ¶ 183).[4] Mr. Black was remanded to the

Manhattan Detention Center, and his bail was set at $50,000. (*Id.* at ¶¶ 184,

---

[3]     The Family Court entered a separate temporary removal order for each of D.B., A.B.,
        J.B., and J.B. Though there appear to be minor variations among these four orders,
        the Court does not believe any of these differences to be material — the language in
        each order is largely the same. The Court cites to these orders interchangeably.

[4]     Plaintiffs do not specify the authority that issued the warrant.

188).  Rather than inform the Family Court where his family was residing, on June 6, 2016, Mr. Black called Mrs. Black from jail and asked her to bring the children to the Family Court.  (*Id.* at ¶¶ 187-88, 196).  Plaintiffs allege that Mr. Black was jailed for 13 days "[a]s punishment for protecting" his family, during which time he was not permitted to speak to an attorney.  (*Id.* at ¶¶ 186, 195).

On June 9, 2016, Mrs. Black and the children arrived at "the court" "to attend a hearing on behalf of Mr. Black."  (Pl. Decl. ¶ 199).[5]  Plaintiffs allege that immediately upon Mrs. Black's arrival at Family Court, the children were "seized and taken to a small room at the Family [C]ourt by court officers."  (*Id.* at ¶ 205).  Plaintiffs allege that the Family Court convened an initial hearing on June 9, 2016, and that Mrs. Black was represented by counsel at the proceeding.  (*Id.* at ¶¶ 214-17).  Later that day, Mr. Black was released from the Manhattan Detention Center, and Plaintiffs returned to New Jersey without their children.  (*Id.* at ¶¶ 220-21).  Thereafter, Plaintiffs visited their children regularly at the ACS Children's Center.  (*See id.* at ¶ 244).  At that time, the children were in ACS's custody and resided at Graham-Windham, a family services organization.  (*See id.* at ¶ 255).

Plaintiffs allege, in somewhat circuitous fashion, that the Family Court held hearings pursuant to § 1028 of the Family Court Act over the next several months.  (*See* Pl. Decl. ¶¶ 261, 278).  Plaintiffs complain throughout their Declaration that the Family Court refused to admit exculpatory evidence (*see,*

---

[5]     Plaintiffs' Declaration does not specify which courthouse Mrs. Black went to, but the Court infers from other facts in the Declaration that Mrs. Black went to Bronx Family Court.

*e.g.*, *id.* at ¶ 467(a)-(o)), that witnesses testified falsely (*id.* at ¶¶ 481-522), and that Defendant tried to coerce Mrs. Black into testifying falsely about her husband (*id.* at ¶¶ 290-98). Plaintiffs further allege a scattered set of grievances about the conduct of ACS and Graham-Windham employees during this time period. For example, Plaintiffs allege: (i) ACS sent NYPD officers to Mrs. Black's workplace to inquire about Mr. Black; (ii) Defendant requested that the Black children be vaccinated despite Plaintiffs' religious objections; (iii) ACS refused to allow Mrs. Black to breastfeed or provide bottles of pumped breastmilk for her newborn daughter; (iv) the children did not receive adequate food, supervision, or care while at Graham-Windham; and (v) Graham-Windham caseworkers refused to use the groceries Plaintiffs brought for their children. (*Id.* at ¶¶ 246-52, 300-06, 336-59, 392-98).

It appears from Plaintiffs' Declaration, though it is not entirely clear, that in January 2017, Plaintiffs were held in criminal contempt by order of the Family Court judge. (Pl. Decl. ¶¶ 370-85). Plaintiffs were detained for three days. (*Id.* at ¶ 385).[6] Mrs. Black was represented by counsel; it is not clear from the Declaration whether Mr. Black also had counsel. (*Id.* at ¶ 374).[7]

---

[6] The Family Court Order states that Plaintiffs sometimes failed to appear for scheduled court dates, but that when they did appear Plaintiffs at times "engaged in disruptive behavior by proffering outlandish and unfounded allegations of conspiracy and corruption against the foster agency, ACS, the attorneys, the Mayor, and the Court." (Fam. Ct. Order 8 n.4). The Family Court Order does not indicate that Plaintiffs were jailed for this behavior.

[7] Plaintiffs later allege that Mr. Black was "denied the opportunity to seek counsel and [was] therefore denied due process." (Pl. Decl. ¶ 389). It is not clear in what timeframe this occurred, and the Family Court Order indicates that both parents had counsel throughout the neglect proceedings. (Fam. Ct. Order 2).

11

Following their release, Plaintiffs continued to visit with their children — these visits, while not germane to Plaintiffs' claims, are described in great detail in Plaintiffs' Declaration. (*Id.* at ¶¶ 401-31).

According to the Family Court Order, the Family Court held fact-finding hearings on March 9, 2017, March 14, 2017, and May 16, 2017. (Fam. Ct. Order 3). ACS called Officer Michaels to address the events of March 12, 2016, and an ACS witness to authenticate certain records. (*Id.*). ACS also presented documentary evidence regarding educational neglect and Mr. Black's criminal case. (*Id.*). Mrs. Black testified at the hearing and presented documentation supporting her contention that she had made efforts to complete the required homeschooling paperwork. (*Id.*). Mr. Black did not appear at the hearings. (*Id.*). Both parents were represented by counsel, as were the children. (*Id.* at 2). On March 17, 2017, Plaintiffs' children were sent to live in California with their maternal grandmother. (Pl. Decl. ¶¶ 447, 470).

On July 13, 2017, Judge Kaplan entered an Order of Fact-Finding and Disposition wherein he found that D.B. and A.B., Plaintiffs' school-aged children, had been educationally neglected insofar as (i) they had never been enrolled in school and (ii) Plaintiffs' at-home education plan did not comport with the requirements of the New York City Department of Education. (Fam. Ct. Order 3-5). Judge Kaplan found further that Mr. Black had failed to provide proper supervision and guardianship for his children given (i) his violent encounter with a neighbor at a time he was the sole caregiver in the home and (ii) his possession of weapons in the home that were kept within the

12

children's reach.  (*Id.* at 5).  Finally, Judge Kaplan determined that Plaintiffs failed to provide adequate food, clothing, and shelter for their children.  (*Id.* at 6).  Judge Kaplan found Mrs. Black's testimony to be incredible or unconvincing.  (*Id.* at 4-6).  The Family Court scheduled a permanency hearing — a hearing at which the parties address plans for the permanent placement of the affected children — for September 5, 2017.  (*Id.* at 10).

On March 5, 2018, Judge Kaplan issued a Permanency Hearing Order. (Dkt. #42-6).  Judge Kaplan found that Plaintiffs had not complied with his order that they undergo mental health evaluations and attend parenting courses.  (*Id.*).  The next permanency hearing is scheduled for August 16, 2018. (*Id.*).

**B.    Procedural Background**

Plaintiffs initiated this action on November 17, 2017; the Complaint contained few factual allegations beyond stating that Plaintiffs' children (referred to as their "property") had been "stolen" on June 9, 2016, and demanding their return.  (Dkt. #1).  The Court held an initial conference with the parties on January 11, 2018, to learn more about Plaintiffs' claims and allegations.  At the conference, Defendant expressed her desire to file a motion to dismiss Plaintiffs' Complaint, and the Court set a briefing schedule.  (*See* Dkt. #23).

On February 2, 2018, Defendant filed a motion to dismiss.  (Dkt. #25-29).  On February 16, 2018, Plaintiffs filed a 60-page Declaration of Facts, a 52-page opposition brief, a notice purporting to impose fines on the

Corporation Counsel, and a "motion for default judgment or alternative resolution in 7 days." (Dkt. #30-33). In recognition of the voluminous and detailed new factual allegations raised in Plaintiffs' submissions, on February 21, 2018, the Court denied Defendant's motion without prejudice, and directed Defendant to file a new motion, if any, by April 2, 2018. (Dkt. #36).

On April 2, 2018, Defendant filed a new motion to dismiss. (Dkt. #40-44). Plaintiffs did not respond in the allotted time but sent an email to the Court containing a link to an online video purporting to show a leak in Plaintiffs' ceiling. (Dkt. #45). On April 25, 2018, Plaintiffs filed a document titled "writ of habeas corpus" alleging that the "emergency [child] removal procedures were unconstitutional" and again seeking the return of their children. (Dkt. #47). Plaintiffs also submitted a Declaration of Facts that appears to be nearly identical to the earlier one with the exception of the discrepancy noted at Footnote 1, above. (*Compare* Dkt. #31, *with* Dkt. #48). Defendant filed a reply on May 4, 2018. (Dkt. #51).

## DISCUSSION

### A. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Defendant has moved to dismiss Plaintiffs' pleadings under Federal Rule of Civil Procedure 12(b)(6). When evaluating the sufficiency of a plaintiff's pleadings, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*,

648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  The Court is not, however, obligated to take as true legal conclusions stated as factual allegations.  *Rolon* v. *Henneman*, 517 F.3d 140, 148-49 (2d Cir. 2008).  Ultimately, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual mater, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Aschroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 554, 570 (2007)).  This plausibility requirement "is not akin to a 'probability requirement'" but "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

In light of Plaintiffs' *pro se* status, the Court will construe their pleadings "liberally and 'interpret them to raise the strongest arguments that they suggest.'" *Pabon* v. *Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)); *see also McLeod* v. *Jewish Guild for the Blind*, 864 F.3d 154, 158 (2d Cir. 2017).

## B. Defendant's Motion to Dismiss Plaintiffs' Federal-Law Claims Is Granted

### 1. Liability Under 42 U.S.C. § 1983

The Court understands Plaintiffs to raise the following claims on their own behalf under 42 U.S.C. § 1983: (i) substantive due process; (ii) procedural due process; and (iii) free exercise.  Plaintiffs also raise the following claims under § 1983 on behalf of their children: (i) improper seizure; (ii) failure to protect; and (iii) false imprisonment.

"[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Okla. City* v. *Tuttle*, 471 U.S. 808, 816 (1985). To plead any claim under § 1983, a plaintiff must show "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis* v. *Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

An essential element of liability under § 1983 is the defendant's personal involvement in the wrongs alleged. *Colon* v. *Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks and citation omitted)). For this reason, the Court considers the sufficiency of Plaintiffs' legal claims only to the extent that they are predicated on events described in Plaintiffs' Declaration in which Defendant was personally involved. To the extent that Plaintiffs raise any of these claims against, for example, officers of the NYPD, those claims fail as those individuals have not been named as defendants in this case.

## 2. Defendant Is Absolutely Immune from Claims Brought Against Her in Her Personal Capacity

Defendant is an attorney at ACS, and she enjoys absolute immunity for claims brought against her in her personal capacity. Though Defendant is not a prosecutor, the Second Circuit has held that "absolute immunity also extends to non-prosecutor officials when they are performing 'functions analogous to those of a prosecutor.'" *Cornejo* v. *Bell*, 592 F.3d 121, 127 (2d

Cir. 2010) (quoting *Butz* v. *Economou*, 438 U.S. 478, 515 (1978)); *see also*

*Golian* v. *N.Y. City Admin. for Children Servs.*, 282 F. Supp. 3d 718, 725-26

(S.D.N.Y. 2017). Accordingly, ACS attorneys are entitled to absolute immunity.

*Cornejo*, 592 F.3d at 128. Further, as Defendant notes, her absolute immunity

extends to Plaintiffs' state-law claims. *Id.* at 130 (citing *Carossia* v. *City of N.Y.*,

835 N.Y.S.2d 102, 104 (1st Dep't 2007)); *see Arteaga* v. *State of N.Y.*, 72 N.Y.2d

212, 220 (1988). Accordingly, the Court will only consider Plaintiffs' claims as

brought against Defendant in her official capacity.

### 3. Plaintiffs May Not Pursue Claims on Behalf of Their Children While Proceeding *Pro Se*

The Court understands Plaintiffs to raise three § 1983 claims (improper

seizure in violation of the Fourth Amendment, failure to protect in violation of

the Fourteenth Amendment, and false imprisonment) and three state-law

claims (assault, battery, and false imprisonment) for violations of their

children's rights. *Pro se* parties are understood to bring claims on their own

behalf and, thus, cannot sue on behalf of others, even their children. *Cheung*

v. *Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990) ("[A]

non-attorney parent must be represented by counsel in bringing an action on

behalf of his or her child."). Plaintiffs may not pursue these claims on behalf of

their children, and the Court will only analyze those claims that Plaintiffs have

brought on their own behalf.

### 4. Plaintiffs' Substantive and Procedural Due Process Claims Fail

There can be no doubt that "parents have a 'constitutionally protected

liberty interest in the care, custody and management of their children.'"

17

*Southerland* v. *City of N.Y.*, 680 F.3d 127, 142 (2d Cir. 2012) (alterations

omitted) (quoting *Tenenbaum* v. *Williams*, 193 F.3d 581, 593 (2d Cir. 1999));

*see also Santosky* v. *Kramer*, 455 U.S. 745, 753-54 (1982). Parents may

vindicate violations of this right under both a substantive and procedural due

process theory. *Southerland*, 680 F.3d at 142.[8]

 For a loss of custody to rise to the level of a substantive due process

violation, a plaintiff must show that "the removal would have been prohibited

by the Constitution even had the plaintiffs been given all the procedural

protections to which they were entitled." *Southerland*, 680 F.3d at 152

(alterations, internal quotation marks and citation omitted). This burden is

met where the facts show that "the state action was 'so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience.'"

*Id.* at 151 (quoting *Okin* v. *Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d

415, 431 (2d Cir. 2009)). But where a child protective agency "has a

reasonable basis for thinking that a child is abused or neglected," a plaintiff's

claim will fail. *Id.* at 152. As this Court recently noted, "[u]nderpinning the

reasonable basis standard is the 'need for unusual deference' to those who

investigate allegations of child abuse or neglect." *Mortimer* v. *City of N.Y.*,

---

[8] As noted above, Plaintiffs attempt to bring a claim for an illegal seizure in violation of the Fourth Amendment on their children's behalf. While Plaintiffs may not bring this claim for their children while proceeding *pro se*, they are similarly unable to bring it on their own behalf, because a parent's right to custody over her children is not cognizable under the Fourth Amendment on an illegal search or seizure theory. *See Southerland* v. *City of N.Y.*, 680 F.3d 127, 143 (2d Cir. 2012) ("A Fourth Amendment child-seizure claim belongs only to the child, not to the parent[.]").

No. 15 Civ. 7186 (KPF), 2018 WL 1605982, at *14 (S.D.N.Y. Mar. 29, 2018)

(quoting *Southerland*, 680 F.3d at 152).

Where children are removed from the home pursuant to a court order,

"any liability for the continuation of the allegedly wrongful separation of parent

and child can no longer be attributed to the officer who removed the child."

*Southerland*, 680 F.3d at 153.  Plaintiffs allege that their children were taken

into ACS custody on June 9, 2016 (Pl. Decl. ¶¶ 203-04), but Judge Kaplan had

in fact issued the Removal Order over two months earlier, on March 18, 2016

(Removal Order).  Because Plaintiffs were not separated from their children

until after a court order had issued, Plaintiffs' substantive due process claim

against Defendant fails.[9]

Plaintiffs' procedural due process claim is similarly unsuccessful.  The

Second Circuit has held that "before parents may be deprived of the care,

custody or management of their children without their consent, due process —

ordinarily a court proceeding resulting in an order permitting removal — must

be accorded to them."  *Tenenbaum*, 193 F.3d at 593.  Here, the Family Court

---

[9]     Based on the allegations set forth in Plaintiffs' Declaration and opposition papers, the Court understands Plaintiffs' claims for "invasion of privacy," "human rights violations," and "parental rights violations" to be, in effect, restatements of their substantive due process claim, and thus does not analyze these claims separately.  The Court is aware that New York recognizes a statutory claim under Civil Rights Law §§ 50 and 51 for invasions of privacy, which statutes "protect against the appropriation of a plaintiff's name or likeness for a defendant's benefit and create a cause of action in favor of any person whose name, portrait, or picture is used for advertising purposes or for trade without the plaintiff's consent." *Farrow* v. *Allstate Ins. Co.*, 862 N.Y.S.2d 92, 93 (2d Dep't 2008).  However, Plaintiffs' privacy claim states that Defendant invaded Plaintiffs' privacy by removing their children without their consent.  (Pl. Opp. 29-30).  In this regard, the Court understands this claim to mirror Plaintiffs' substantive due process claim.

held a hearing under § 1027 of the Family Court Act on March 18, 2016, after ACS filed a neglect petition on March 17, 2016. (Removal Order). Under § 1027, parents are entitled to notice of the proceedings, though the hearing may proceed even if they fail to appear. N.Y. Fam. Ct. Act §§ 1023, 1027(a)(iv). The Removal Order states that Bonilla gave Plaintiffs notice of the § 1027 hearing. (Removal Order). Plaintiffs allege they received no such notice. (*See* Pl. Decl. ¶ 167). As this Court has very recently discussed, the Second Circuit has not held that parents are constitutionally entitled to notice of § 1027 hearings, and several district courts in this Circuit have expressed doubt that notice is constitutionally required. *Mortimer*, 2018 WL 1605982, at *16-18 (citations omitted). In *Mortimer*, the Court held that parents have a right "to notice and a hearing before the removal of a child from the home absent exigent circumstances[.]" *Id.* at *18.

The Court is reluctant to analyze at this early stage of the litigation whether exigent circumstances existed warranting the removal of Plaintiffs' children. Ultimately, resolution of the issue does not impact the viability of Plaintiffs' procedural due process claim. Even assuming there were no exigent circumstances justifying the removal of Plaintiffs' children and, further, that Plaintiffs had a constitutional right to notice of the § 1027 hearing that was violated, Plaintiffs' claim would still fail. Plaintiffs may not bring this claim against Defendant in her personal capacity, and as Defendant correctly notes, Plaintiffs' claim against Defendant in her official capacity is effectively a suit against the municipality. (Def. Br. 8). *See Ky.* v. *Graham*, 473 U.S. 159, 165-

66 (1985) ("Official-capacity suits … 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (citing *Monell* v. *N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978))). For municipal liability to attach on a § 1983 claim, "a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." *Hartline* v. *Gallo*, 546 F.3d 95, 103 (2d Cir. 2008) (internal quotation marks and citation omitted). Plaintiffs' Declaration and opposition do not identify an official policy pursuant to which their procedural due process rights were violated, nor do they allege the existence of a pattern of a failure to notify parents of proceedings in the family court system. (*See* Pl. Decl. 21-22; *see generally* Pl. Decl.). Accordingly, the Court cannot find, even construing Plaintiffs' claims liberally, that any procedural due process violation was the product of an official act or policy.

Plaintiffs appear to allege that Defendant failed to abide by official policies that ACS put in place to protect parental rights, and the Court understands Plaintiffs to bring this claim under a "failure to train" theory of *Monell* liability. (Pl. Opp. 21 ("[Defendant] also had a duty to use reasonable care to select, assign, supervise, train, control, and review the activities of their agents, officers, [and] employees[.]"); *id.* at 22 (alleging that Defendant "act[ed] with deliberate indifference in providing the constitutional protections guaranteed … [in] child neglect [ ] proceedings")). To the extent that Plaintiffs' failure to train theory extends to any procedural due process violation they may

have experienced, it likewise fails.  The Supreme Court has said that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick* v. *Thompson*, 563 U.S. 51, 61 (2011).  Even so, a plaintiff may prevail on such a claim where a municipality has acted with deliberate indifference; that is to say, where

> [i] a policymaker knows to a moral certainty that city employees will confront a particular situation; [ii] the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the situation; and [iii] the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Wray* v. *City of N.Y.*, 490 F.3d 189, 195-96 (2d Cir. 2007) (internal quotation marks and citations omitted).

In effect, a municipality's deliberate indifference is a "conscious disregard of the risk that poorly-trained employees will cause deprivations of clearly established constitutional rights."  *Wray*, 490 F.3d at 196.  Importantly, Plaintiffs must show "[a] pattern of similar constitutional violations by untrained employees … to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, 563 U.S. at 62.  Here, even if Plaintiffs have shown that Defendant (and, by extension, the City) was derelict in failing to provide notice of the March 18, 2016 § 1027 hearing, they have not shown that such a violation was the result of deliberate indifference or part of a broader pattern of conduct by municipal actors.  On this basis, Plaintiffs' procedural due process claim fails.

### 5. Plaintiffs' Free Exercise Claim Fails

Plaintiffs do not expressly raise a claim under the First Amendment. Defendant construes Plaintiffs' submissions to raise a First Amendment claim based on "a few offhand references to the First Amendment" and an allegation that Defendant requested that the Family Court order that the children be vaccinated. (Def. Br. 10 (citing Pl. Decl. ¶¶ 301-32)). Plaintiffs allege that their children were vaccinated without their consent and over Plaintiffs' religious objections. (Pl. Decl. ¶¶ 301-32). Plaintiffs state that Judge Kaplan entered such an order after finding their religious beliefs to be insincere. (*Id.* at ¶ 306-07). As with Plaintiffs' procedural due process claim, they fail to establish municipal liability for alleged violations of their First Amendment rights to oppose vaccinations. Plaintiffs do not allege any municipal policy or any pattern of mandatory vaccination. The Court cannot, on the facts presented in Plaintiffs' Declaration, find that they state a plausible claim to relief.

### C. Defendant's Motion to Dismiss Plaintiffs' State-Law Claims Is Granted

Plaintiffs bring the following claims under New York state law: (i) intentional infliction of emotional distress; (ii) negligent infliction of emotional distress; (iii) negligence, which the Court understands to be largely duplicative of their negligent infliction of emotional distress claim; (iv) "children's tort"; (v) assault; and (vi) battery. While the Court has dismissed all of Plaintiffs' federal claims, it retains supplemental jurisdiction to review Plaintiffs' state-law claims. The Court does so with due regard for comity and deference to the New York state courts, but is swayed by the need to promote

convenience, fairness, and judicial economy. *See Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). Plaintiffs are proceeding *pro se* and will be inconvenienced by having to re-file their claims in state court; moreover, the Court does not understand that Defendant will be prejudiced by a resolution of Plaintiffs' state-law claims in this Court. More to the point, the Court recalls its initial conference with the parties and the concern with which Plaintiffs presented their claims to the Court. Plaintiffs desire a swift resolution of this case, and the Court is reluctant to delay that resolution any further. Upon considering the sufficiency of Plaintiffs' state-law claims, the Court finds that Plaintiffs fail to plead any state-law claim against Defendant in her official capacity upon which relief can be granted. The Court explains the deficiencies of each claim in turn.

As a preliminary matter, Defendant argues that the Court lacks subject matter jurisdiction to hear Plaintiffs' state-law tort claims because Plaintiffs failed to file a notice of claim with the New York City Comptroller within 90 days after their claims arose. (Def. Br. 23 (citing N.Y. Gen. Mun. Law § 50-e)). Defendant is correct that "a notice of claim is a condition precedent to bringing personal injury actions against municipal corporations[,]" and that tort plaintiffs must plead compliance with the law. *Hardy* v. *N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). It is true that Plaintiffs do not allege that they have complied with § 50-e, but the Court is concerned that this oversight may be the product of Plaintiffs' *pro se* status. If Plaintiffs have not complied with the statute, the Court plainly lacks subject matter jurisdiction

even to consider the state-law claims.  As detailed in the remainder of this section, moreover, Plaintiffs' allegations also fail to state a claim.

### 1.    Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress

Under New York law, intentional infliction of emotional distress ("IIED") requires a plaintiff to show "[i] extreme and outrageous conduct; [ii] intent to cause, or disregard of a substantial probability of causing, severe emotional distress; [iii] a causal connection between the conduct and injury; and [iv] severe emotional distress, *Scollar* v. *City of N.Y.*, Index No. 155608/14, — N.Y.S.3d —, 2018 WL 1414084, at *3 (1st Dep't Mar. 22, 2018) (internal quotation marks and citation omitted), whereas negligent infliction of emotional distress ("NIED") does not require a showing of extreme or outrageous conduct, *Taggart* v. *Costabile*, 14 N.Y.S.3d 388, 397 (2d Dep't 2015).  The former cause of action fails against Defendant because "[p]ublic policy bars claims alleging [IIED] against governmental entities."  *Afifi* v. *City of N.Y.*, 961 N.Y.S.2d 269, 270 (2d Dep't 2013) (citations omitted).  The latter fails because, while the Court does not doubt the sincere emotions Plaintiffs have experienced throughout the proceedings in the Family Court, Plaintiffs' Declaration does not set forth any facts that plausibly suggest that Defendant acted with the intent to cause them emotional distress as she carried out her duties as an attorney for ACS.  These claims both fail.

### 2.    "Children's Tort"

Plaintiffs bring a claim titled "children's tort," which claim the Court construes as a negligence claim with respect to Defendant's placement of

Plaintiffs' children in a foster home. Plaintiffs allege that Defendant breached a duty of reasonable care by placing the children into two foster homes where there were other children in the home who had "dangerous predilections and propensities" or a history of committing physical violence against others, and where the guardian had a "proven inability to care for an infant, had a propensity to lie against birth parents and slander children within her care for financially incentivized findings." (Pl. Opp. 26). Plaintiffs state that, in consequence of Defendant's negligence, they have "suffered extreme emotional and physical distress[.]" (*Id.*).

While "[c]ounties and foster care agencies cannot be vicariously liable for the negligence acts of foster parents, who are essentially contract service providers[,]" these entities "may be sued to recover damages for negligence in the selection of foster parents and in supervision of the foster home." *Keizer* v. *SCO Family of Servs.*, 991 N.Y.S.2d 103, 104-05 (2d Dep't 2014) (citations omitted). "[T]o find that a child care agency breached its duty to adequately supervise the children entrusted to its care, a plaintiff must establish that the agency 'had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated." *Mortimer*, 2018 WL 1605982, at *25 (internal quotation marks omitted) (citing *Simpson* v. *Cty. of Dutchess*, 826 N.Y.S.2d 678, 680 (2d Dep't 2006)). Plaintiffs' broad but conclusory claims do not meet this burden. While it is clear from Plaintiffs' Declaration and opposition that they do not feel that their children were adequately cared for while in foster care, there is no

26

indication in their claims that Defendant knew that Plaintiffs' children had been placed in homes where there was a risk of violence or dangerous conduct. Accordingly, this claim fails.

### 3. Assault and Battery

Plaintiffs bring assault and battery claims on behalf of their children which, as noted above, they may not do while proceeding *pro se*. But the Court construes these claims broadly and understands Plaintiffs to allege that Mr. Black was assaulted when officers put a gun to his head and that Mrs. Black was battered by court officers in the Family Court. (Pl. Opp. 28-29).[10] These claims are time-barred. As Defendant correctly argues, under the New York Civil Practice Law and Rules § 217-a, Plaintiffs needed to file this personal injury action against a government officer within one year and 90 days after the claims accrued. (Def. Br. 23-24). The Court agrees with Defendant that any claims accruing before August 19, 2016, are time-barred. Because Plaintiffs' allegations relating to their IIED, NIED, and "children's tort" claims extend beyond this time, those claims are timely, but Plaintiffs' assault and battery claims relate to events before August 19, 2016, and are time-barred.

In any event, neither the alleged assault nor the alleged battery was committed by Defendant. *See Colon*, 58 F.3d at 873. To get around this fact,

---

[10] Under New York law, "[a] civil assault 'is an intentional placing of another person in fear of imminent harmful or offensive contact'; civil battery 'is an intentional wrongful physical contact with another person without consent.'" *Charkhy* v. *Altman*, 678 N.Y.S.2d 40, 41 (1st Dep't 1998) (quoting *United Nat'l Ins. Co.* v. *Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993)).

Plaintiffs allege that Defendant joined a conspiracy with the police and the court officers and is thus responsible for all acts committed within the conspiracy. (Pl. Opp. 28-29). Plaintiffs' fleeting and conclusory allegations do not amount to a plausible claim for civil conspiracy,[11] and these claims must be dismissed.

## D. The Court Cannot Overturn the Family Court's Order

Despite Plaintiffs' heartfelt wishes, the Court cannot issue an order retuning to Plaintiffs the custody of their five children. (*See* Pl. Opp. 51 (requesting "Return of Stolen Property")). This is so for several reasons. *First*, this Court does not have subject matter jurisdiction to hear a direct challenge to the Family Court Order. A claim seeking the return of Plaintiffs' children is effectively a claim asking the Court to overturn Judge Kaplan's neglect and custody determinations, and this is barred by the *Rooker-Feldman* doctrine[12]:

---

[11]   Civil conspiracy is established where there is an underlying tort and "[i] an agreement between two or more parties; [ii] an overt act in furtherance of the agreement; [iii] the parties' intentional participation in the furtherance of a plan or purpose; and [iv] resulting damage or injury." *Uni-World Capital, L.P.* v. *Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 251 (S.D.N.Y. 2014). To the extent that Plaintiffs bring this claim under § 1985, the Court does not understand Plaintiffs to allege the existence of a conspiracy for the purpose of depriving them of equal protection of the laws. *See Brown* v. *City of Oneonta, N.Y.*, 221 F.3d 329, 341 (2d Cir. 2000).

[12]   *See generally Rountree* v. *US Bank NA*, No. 15 Civ. 9018 (KPF), 2017 WL 31405, at *7 (S.D.N.Y. Jan. 3, 2017):

> 28 U.S.C. § 1257 vests the United States Supreme Court with exclusive jurisdiction to hear "appeals from final state-court judgments." *Lance* v. *Dennis*, 546 U.S. 459, 463 (2006) (per curiam). Thus, "under what has come to be known as the *Rooker-Feldman* doctrine, lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Id.* (discussing *Dist. of Columbia Court of Appeals* v. *Feldman*, 460 U.S. 462, 482 (1983), and *Rooker* v. *Fidelity Tr. Co.*, 263 U.S. 413, 416 (1923)). "Under this doctrine, federal district courts lack jurisdiction over cases that essentially amount to appeals of state court judgments, including claims that are inextricably intertwined

The custody issue was decided by the Family Court, and Plaintiffs were represented by counsel in those proceedings; despite Plaintiffs' protestations to the contrary, it appears from the record before the Court that they had a full and fair opportunity to litigate the proper custody of their children. *See Phifer* v. *City of N.Y.*, 289 F.3d 49, 57 (2d Cir. 2002) (holding that a direct attack on a Family Court order was barred by *Rooker-Feldman* where traditional collateral estoppel principles were satisfied). Plaintiffs state that the Family Court Order is not a final order. (Pl. Opp. 38). The Court understands that the Family Court continues to hold hearings regarding the custody of Plaintiffs' children, but the Family Court Order meets all of the requirements courts consider under *Rooker-Feldman,* and review of that order would be improper: Plaintiffs lost in the state court, and they complain of injuries caused by and invite review of a state-court judgment that was rendered before this action was filed. *See Green* v. *Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009).

*Second,* even if the Family Court Order is not a final judgment because the neglect and custody proceedings are ongoing, *Younger* abstention[13]

---

with a prior determination of a state court." *Harriot* v. *JP Morgan Chase Bank NA*, No. 16 Civ. 211 (GBD), 2016 WL 6561407, at *3 (S.D.N.Y. Oct. 21, 2016) (internal quotation marks and citations omitted). Courts sparingly apply *Rooker-Feldman. See Exxon Mobil Corp.* v. *Saudi Basic Indus. Corp.*, 544 U.S. 280, 287-88 (2005) (collecting cases).

[13]     In *Younger* v. *Harris*, 401 U.S. 37 (1971), the Supreme Court articulated "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Cnty. Ethics Comm.* v. *Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). Under *Younger,* courts abstain "from exercising jurisdiction only in three 'exceptional circumstances' involving [i] 'ongoing state criminal prosecutions,' [ii] 'certain civil enforcement proceedings,' and [iii] 'civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Falco* v. *Justices of the Matrimonial Parts of the Supreme Court*

precludes the Court from intervening in those proceedings or issuing orders that frustrate the state's interest in enforcing the orders of the Family Court. *Bukowski* v. *Spinner*, 709 F. App'x 87, 88 (2d Cir. 2018) (summary order) (citing *Falco* v. *Justices of the Matrimonial Parts of Supreme Court of Suffolk Cty.*, 805 F.3d 425, 428 (2d Cir. 2015)).

## E.    Leave to Amend Is Denied

Plaintiffs make a passing request to amend their pleadings "as more information becomes available." (Pl. Opp. 31, 52). Federal Rule of Civil Procedure 15(a)(2) instructs that a court "should freely grant leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The decision to grant or deny leave to amend is soundly within the discretion of the district court, and here the Court finds that amendment would be futile and denies the request.

The Court is mindful that a *pro se* plaintiff should often be given at least one opportunity to amend. *Grullon* v. *City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013). Plaintiffs initiated this action with a complaint that set forth almost no facts (Dkt. #1), and supplemented that pleading with a 60-page declaration of facts and 52-page opposition (that itself contained additional

---

*of Suffolk Cty.*, 805 F.3d 425, 427 (2d Cir. 2015) (quoting *Sprint Commc'ns, Inc.* v. *Jacobs*, 571 U.S. 69, 78 (2013)).

The policy animating abstention, the *Younger* Court explained, derives from

> the notion of comity, that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Younger*, 401 U.S. at 44 (internal quotation marks omitted).

facts) in response to Defendant's first motion to dismiss. In light of Plaintiffs' voluminous additions that were made in direct response to Defendant's proffered bases for dismissal, and having identified several fundamental deficiencies in Plaintiffs' claims, the Court finds that further amendment would not remedy Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:    June 7, 2018
         New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

*Sent by First Class Mail to:*
Autumn Black
Hemerd Black
P.O. Box 2286
New York, NY 10108